123 F.Supp.2d 965 (2000)
The CHRISTIAN SCIENCE BOARD OF DIRECTORS OF the FIRST CHURCH OF CHRIST, SCIENTIST; and The Christian Science Publishing Company, Plaintiffs,
v.
David E. ROBINSON; The Roan Mountain Institute of Christian Science & Health; David J. Nolan; and University of Christian Science, Defendants.
No. Civ. 1:99CV148.
United States District Court, W.D. North Carolina, Asheville Division.
October 4, 2000.
*966 *967 *968 Catharine B. Arrowood, Brian D. Darer, Parker, Poe, Adams & Bernstein, Raleigh, NC, Joseph H. Lessem, Cowan, Liebowitz & Latman, P.C., New York City, for The Christian Science Board of Directors of First Church of Christ, Scientist, The Christian Science Publishing Society, plaintiffs.
David E. Robinson, Bakersville, NC, pro se.
John H. Hasty, John Watson Bowers, Waggoner, Hamrick, Hasty, Monteith & Kratt, PLLC, Charlotte, NC, Brenda A. Buan, Morris M. Goldings, Mahoney, Hawkes & Goldings, LLP, Boston, MA, for David J. Nolan, University of Christian Science.

MEMORANDUM AND ORDER
THORNBURG, District Judge.
THIS MATTER came before the undersigned on September 25, 2000, for a hearing on the Plaintiffs' motion to hold the Defendants in contempt of the Judgment entered on July 6, 2000. Approximately one hour before the hearing, the undersigned learned that on Thursday, September 21, 2000, Defendants Nolan and The Christian Science University (Nolan Defendants) had filed a notice of appeal from the undersigned's ruling of September 20, 2000, and a motion for a stay of the injunction pending appeal with the Clerk's Office in Charlotte, North Carolina.[1] As a result, this decision addresses not only the issue of contempt but that motion as well.

1. Motion to stay enforcement of the injunction pending appeal.
The Court first addresses the motion to stay the injunction pending appeal pursuant to Federal Rule of Civil Procedure 62(c).[2] In determining whether to stay an injunction pending appeal, the Court is required to consider (1) whether the applicant for the stay has shown a substantial likelihood of prevailing on the merits; (2) whether the applicant will be irreparably harmed absent a stay; (3) whether issuance of the stay will substantially injure other parties to the appeal; and (4) the public interest. Hilton v. Braunskill, 481 U.S. 770, 107 S.Ct. 2113, 95 L.Ed.2d 724 (1987); Planned Parenthood of the Blue Ridge v. Camblos, 116 F.3d 707 (4th Cir.1997), cert. denied, 525 U.S. 1140, 119 S.Ct. 1031, 143 L.Ed.2d 40 (1999).
The Nolan Defendants' motion is based on two arguments: (1) the undersigned erroneously ruled that North Carolina's long arm statute allows it to assert personal jurisdiction over them, and (2) the Lanham Act does not extend to religious speech because it is non-commercial. During the hearing, counsel argued there is "absolutely no evidence" that Nolan ever sent electronic mail into North Carolina or had sufficient contacts with the state to warrant the exercise of long arm jurisdiction.[3] This case, he argued, involves the communication of religious ideas, not commercial services, and thus, is not governed by traditional notions of minimum contacts. Nolan did not purposefully direct toward North Carolina residents the solicitation of business or commercial enterprise, although admittedly, at some point he offered for sale books and other publications. Although counsel admitted Nolan *969 sent materials into the State for use on his web site, which was established in this State, he claimed that when a religious organization is involved, it is in the public interest to allow the free disbursement of information.
Defendant Robinson, a North Carolina resident, appeared at the hearing pro se and advised the Court that he contacted Nolan in early 1999 and offered to set up a web site for The Christian Science University on his domain. Robinson downloaded Nolan's web site design and used it as a web page for The Christian Science University. Thereafter, Nolan and he communicated frequently by electronic mail to exchange information to be placed on the site. After the Plaintiffs began this lawsuit, Nolan told Robinson to remove his web site from Robinson's domain. Nolan then moved his site to a different domain.
Plaintiffs' counsel noted that Nolan's original web site could only be accessed through Robinson's web site which is indisputably located in North Carolina. Robinson was both the billing and administrative contact, i.e., the "webmaster." In fact, Nolan could not even remove his web site, and the infringing materials, without the assistance of Robinson.
The Nolan Defendants, in addressing the likelihood of success on the merits, claim they will successfully obtain a reversal of the undersigned's finding of jurisdiction on appeal. In addition, they argue the Lanham Act does not apply to the maintenance of a "passive" web site promoting religious speech.
First, the Lanham Act prohibits the use "in commerce" of any reproduction or colorable imitation of a registered mark "in connection with the sale ... distribution or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive."[4] 15 U.S.C. § 1114. "The nature of the Internet indicates that establishing a typical home page on the Internet, for access to all users, would satisfy the Lanham Act's `in commerce' requirement." Planned Parenthood Fed'n of America, Inc. v. Bucci, 42 U.S.P.Q.2d 1430, 1434 (S.D.N.Y.1997), aff'd, 152 F.3d 920, 1998 WL 336163 (2nd Cir.), cert. denied, 525 U.S. 834, 119 S.Ct. 90, 142 L.Ed.2d 71 (1998). The Nolan Defendants argue that their passive Internet web site promoting their religious beliefs was not used "in connection with the distribution or advertising of goods or services."
When a domain name[5] is used on a web site that promotes or preaches social, religious or political beliefs, the Lanham Act would not be triggered unless there is some provision of services or a commercial aspect to the web site. The 1997 Planned Parenthood case was the first time that a court directly faced the issue of finding a commercial use when an otherwise infringing domain name is used on a political or religious web site. In the Planned Parenthood case, the court found that the Lanham Act was triggered and issued a preliminary injunction against use of the domain name "plannedparenthood.com" as used on a web site by an anti-abortion religious activist. The court found that such a use of the domain name was an infringement of the service mark rights of plaintiff Planned Parenthood. Defendant was a religious talk show host who vigorously espoused the right-to-life position. Plaintiff Planned Parenthood was *970 a family planning organization which had a web site under the domain name "ppfa.org." To get his religious message across to those looking for the Planned Parenthood web site, defendant reserved ... the domain name "plannedparenthood.com" and displayed on the site extensive excerpts from a right-to-life book, together with information about its author. The evidence showed that a number of people looking for plaintiff's home page tried defendant's plannedparenthood.com site and as the page down-loaded the first thing they saw were the words "Welcome to the Planned Parenthood home page!" ... [T]he court found that defendant's use was an infringement of plaintiff's registered mark under [the] Lanham Act [ ] because defendant used its accused domain name in connection with the distribution or advertising of goods or services for three reasons: (1) the web page promoted a right-to-life book, a use which was similar to a publisher's home page advertising its wares; (2) defendant offered, free of charge on his web page, information services about the alleged moral evils of abortion; (3) defendant's domain name was used "in connection with" the plaintiff's goods and services because it is likely to prevent some Internet users from reaching plaintiff's own web site.
4 McCarthy, at § 25:76 (footnote added).
In addition to the domain name, the defendant in Planned Parenthood created a home page that used the plaintiff's mark and conveyed the message that the plaintiff sponsored the site. The case at hand is indistinguishable: Defendants both used a domain name invoking "Christian Science" and designed a home page on their web site which infringed Plaintiffs' marks. The complaint alleged that Nolan maintained an Internet web site "in the State of North Carolina resident on the Robinson/TRMI website under the domain name ...." Complaint, filed July 23, 1999, at ¶ 9. It also alleged that Nolan used the Cross and Crown registered marks and other Christian Science marks in connection with products and services sold and made available to the public through both printed materials and on the web site. Id., at ¶ 's 36-37. Moreover, it was alleged that on the web site, Nolan held his University out as affiliated with the Plaintiffs' official education arm. Id., at ¶ 38.
Nolan's counsel argued that during the time prior to the initiation of this action, Nolan was not offering anything for sale, although he admitted that thereafter services, seminars, books, classes, etc., were offered for sale. However, there is no profit requirement in the Lanham Act. United We Stand America, Inc. v. United We Stand America, N.Y., Inc., 128 F.3d 86 (2nd Cir.1997), cert. denied, 523 U.S. 1076, 118 S.Ct. 1521, 140 L.Ed.2d 673 (1998) (The Act's requirement that an infringing use be in "commerce" encompasses non-profit services.). Like the Planned Parenthood defendant, Nolan used this site to provide informational services to convince people that his version of Christian Science is the "true" version. Planned Parenthood, 42 U.S.P.Q.2d at 1435. "In this way, defendant offers his own set of services, and his use of plaintiff[s'] mark is in connection with the distribution of those services over the Internet." Id. (citing MGM-Pathe Communications v. Pink Panther Patrol, 774 F.Supp. 869 (S.D.N.Y.1991) (a group formed to offer the free service of protecting gay individuals from assault was subject to the Lanham Act)). The fact that Nolan criticizes the Plaintiffs does not provide immunity. Id. Moreover, as did Nolan, the defendant in Planned Parenthood solicited funds through the Internet and encouraged followers to enlist in his cause. The "defendant offer[ed] informational services for use in convincing people that certain activities, including the use of plaintiff[s'] services, are morally wrong. In this way, defendant offers his own set of services, and [defendants'] use of plaintiff[s'] mark *971 is in connection with the distribution of those services over the Internet." Id., at 1435. In the provision of those services, Nolan is conveying the impression to Internet users that he is actually a part of or sponsored by the Plaintiffs. Id., at 1437. Thus, contrary to Defendants' position, the Lanham Act does apply to "the free distribution of information services" concerning the Defendants' religious beliefs on the Internet. McCarthy, supra; accord, United We Stand America, supra; Jews for Jesus v. Brodsky, 993 F.Supp. 282, 308 (D.N.J.), aff'd, 159 F.3d 1351 (3rd Cir.1998) (Use of plaintiff's domain name and marks "constitutes a commercial use of the Mark and the Name of the Plaintiff Organization because it is designed to harm the Plaintiff Organization commercially by disparaging it and preventing the Plaintiff Organization from exploiting the Mark and the name of the Plaintiff Organization."); People for the Ethical Treatment of Animals, Inc. v. Doughney, 113 F.Supp.2d 915 (E.D.Va.2000).
The Court also rejects the Defendants' argument that their speech is protected under the First Amendment. Plaintiffs have not in any manner attempted to restrain Defendants' speech on any subject, including the Plaintiffs; however, they do insist that the Defendants not use their marks. Planned Parenthood, 42 U.S.P.Q.2d at 1440. "Defendant's use of another entity's mark is entitled to First Amendment protection when his use of that mark is part of a communicative message, not when it is used to identify the source of a product." Id.; Westchester Media v. PRL USA Holdings, Inc., 214 F.3d 658, 672 (5th Cir.2000) ("[S]peech that misleads or creates confusion is not protected under the First Amendment."). Defendants are using Plaintiffs' marks "to suggest the same source identification as plaintiffs." United We Stand America, 128 F.3d at 93. "This is precisely the use that is reserved by the Lanham Act to the owner of the mark. Even assuming that [Defendants] might communicate [their religious] message more effectively by appropriating [Plaintiffs' marks], such appropriation would cause significant consumer confusion. It is not protected by the First Amendment." Id.; accord, People for the Ethical Treatment of Animals, Inc., supra.
Therefore, the Defendants cannot show a likelihood of success on the merits on the issue of whether their conduct falls within that proscribed by the Lanham Act. As to jurisdiction, North Carolina's long arm statute provides for the exercise of personal jurisdiction over non-resident defendants in any action for injury to property within this State
arising out of an act or omission outside this State by the defendant, provided in addition that at or about the time of the injury either: (a) Solicitation or services activities were carried on within this State by or on behalf of the defendant; (b) Products, materials or things processed, serviced or manufactured by the defendant were use or consumed, within this State in the ordinary course of trade; or (c) Unsolicited bulk commercial electronic mail was sent into or within this State by the defendant using a computer, computer network, or the computer services of an electronic mail service provider in contravention of the authority granted by or in violation of the policies set by the electronic mail service provider....
N.C.Gen.Stat. § 1-75.4(4) (emphasis added). The Nolan Defendants contend none of these subsections provides personal jurisdiction over them because their only contact with North Carolina was a passive web site on the Internet. And, without any citation to authority, Defendants maintain that long arm jurisdiction may not be availed by a nonresident plaintiff. "Subject only to the doctrine of forum non conveniens, an out-of-state plaintiff may use state courts in all circumstances in which those courts would be available to state citizens." Burnham v. Superior *972 Court of California, 495 U.S. 604, 638, 110 S.Ct. 2105, 109 L.Ed.2d 631 (1990). Moreover, where a party consents to the jurisdiction of a court, it is not necessary to determine if the traditional notions of fair play and justice are offended. Johnston County, N.C. v. R.N. Rouse & Co., 331 N.C. 88, 95-96, 414 S.E.2d 30, 34-35 (1992) (citing Burger King Corp. v. Rudzewicz, 471 U.S. 462, 473 n. 14, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) and Dillon v. Numismatic Funding Corp., 291 N.C. 674, 677, 231 S.E.2d 629, 630-31 (1977) (involving a plaintiff who was a nonresident at the time of the injury)).
Moreover, the issue of long arm jurisdiction is determined from the complaint and affidavits presented; thus, "the burden on the plaintiff[s] is simply to make a prima facie showing of a sufficient jurisdictional basis in order to survive the jurisdictional challenge." Combs v. Bakker, 886 F.2d 673, 676 (4th Cir.1989); accord, In re Celotex Corp., 124 F.3d 619, 624 (4th Cir.1997). "In deciding whether the plaintiff has proved a prima facie case of personal jurisdiction, the district court must draw all reasonable inferences arising from the proof, and resolve all factual disputes, in the plaintiff's favor." Mylan Labs., Inc. v. Akzo, N.V., 2 F.3d 56, 60 (4th Cir.1993).
In cases of trademark infringement, the wrong occurs not only at the place where the infringing label is affixed but also where the confusion occurs. 4 McCarthy, at § 32:39; Keds Corp. v. Renee Int'l Trading Corp., 888 F.2d 215, 218 (1st Cir.1989) (interpreting a long arm statute virtually identical to that of North Carolina). Here, the infringement and confusion both occurred in North Carolina. To establish personal jurisdiction over a foreign defendant pursuant to N.C.Gen. Stat. § 1-75.4(4)(a), Plaintiffs must establish (1) an action claiming injury to persons or property within the State of North Carolina; (2) arising from activities by the Defendants outside of North Carolina; and (3) the solicitation or provision of services in North Carolina at or about the time of the injury.[6]Inspirational Network, Inc. v. Combs, 131 N.C.App. 231, 237, 506 S.E.2d 754, 759 (1998). Defendants, while in California, instructed Robinson to establish a web site and home page using infringing marks. That site was accessed only through Robinson's domain, located and maintained in North Carolina. During the use of this site (and before the action was begun), Nolan e-mailed to Robinson the information to be placed on the web site, the web page and its hyperlinks, information which included the infringing use of Plaintiffs' marks. Defendants' conduct constituted the solicitation or provision of services under the Lanham Act and North Carolina law. See, e.g., Fran's Pecans, Inc. v. Greene, 134 N.C.App. 110, 113, 516 S.E.2d 647, 650 (1999) (Misappropriation of trade secrets and damage to business reputation occurred when former president of plaintiff corporation took trade secrets with him to new job with foreign defendant and used that information in determining pricing for foreign corporation and in soliciting business in North Carolina.). This injured Plaintiffs' mark within the State of North Carolina and created the possibility of confusion to North Carolina residents and consumers. Dowless v. Warren-Rupp Houdailles, Inc., 800 F.2d 1305, 1307 (4th Cir.1986) (Lanham Act violations meet the local injury requirement of the long arm statute.); Regent Lighting Corp. v. American Lighting Concept, Inc., 25 F.Supp.2d 705, 709 *973 (M.D.N.C.1997). The above analysis shows that Plaintiffs' action for injury to its trademarks in North Carolina occurred as a result of the Nolan Defendants' conduct in California when they sent via e-mail and other computer services into this state web site, web page and hyperlink information which contained infringements of Plaintiffs' marks and which were made available to the public at large and to North Carolina residents in particular.[7] N.C.Gen.Stat. § 1-75.4(4)(a).
Jurisdiction is also established under § 1-75.4(4)(b). Plaintiffs claim their trademarks were injured in North Carolina by the conduct of the Defendants, directed from California, which offered Defendants' "The Christian Science University" products and materials for use or consumption in North Carolina in the ordinary course of trade.[8] As seen from the discussion above, the Defendants engaged in more than establishing a passive web site. Defendants argue that prior to the initiation of the action, they were not offering anything for sale although they admit that thereafter seminars, books and a variety of services were so offered. However, the statute requires that "at or about the time of the injury," the Defendants sent into North Carolina information about "The Christian Science University," using Plaintiffs' marks, which Nolan created and it was offered both free of charge and through the purchase of books, seminars, etc., on the web site accessed through Robinson's web site having a North Carolina base.
"[T]he plaintiff[s] [were] the focus of the activities of the defendant out of which the suit arises ... the brunt of the harm, in terms [] of ... the injury to [its marks] was suffered in [North Carolina]. In sum, [North Carolina] is the focal point both of the [infringing information] and of the harm suffered. Jurisdiction over [defendants] is therefore proper in [North Carolina] based on the `effects' of their [California] conduct in [North Carolina]."
Saxon v. Smith, 125 N.C.App. 163, 172, 479 S.E.2d 788, 794 (1997) (quoting Calder v. Jones, 465 U.S. 783, 788-89, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984)) (finding personal jurisdiction pursuant to § 1-75.4(4)(b) over Virginia defendant who pressed charges against plaintiff in Virginia and mailed disparaging letter concerning plaintiff from Virginia to North Carolina customers who were "less than 7%" of his mailing list.).
Indeed, Plaintiffs have established long arm jurisdiction pursuant to § 1-75.4(3) which provides for jurisdiction in an action claiming injury to property in the State arising out of an act within this State by the defendant. "[D]efendants' alleged publication of [infringing] material in North Carolina would constitute a `claim[ ][for] injury to [property] ... within this State arising out of an act ... within this State by the defendant[s],' thus conferring personal jurisdiction...." Id., at 170, 479 S.E.2d at 793.
Despite the clear application of the long arm statute to the facts at hand, Defendants argue that cases from other jurisdictions involving "cyberspace" cases are controlling. Defendants claim their web site was totally "passive" and thus, personal jurisdiction may not be invoked. They also argue that none of their conduct was commercial at the time of the initiation of the action; thus, jurisdiction may not be invoked.
*974 Nolan averred that at an undisclosed time during the spring of 1999, he put in place the web site which, he claimed, contained only information about the Christian Science religion and, albeit containing infringing uses of Plaintiffs' marks, did not at that time offer anything for sale. Defendant Robinson advised that he downloaded the web page design from Nolan's computer to his computer in North Carolina and Nolan, on a consistent basis, e-mailed instructions and information to him in North Carolina for placement on the site. In November 1999, Nolan admits he began offering items for sale, including books, publications, audio and video cassettes and seminar attendance.
Attached as Exhibit G to the Plaintiffs' complaint is a copy of information on the Defendants' web site in June 1999. In addition to using infringing marks, the home page contains information which would lead any reasonable person to believe that the "University" was sponsored by the Plaintiffs. "To date, approximately one third of The Fifty-Six Degrees which comprise the University's academic curriculum have been uploaded onto the web site." Exhibit G. The web page also provided information on the upcoming "University Library," live chat rooms, weekly lecture series, video tape productions of seminars, "a University Press which will produce an electronic quarterly publication title, The Christian Science Digest, which will publish articles and literary productions on Christian Science, ... a Seeker's Question and Answer forum, ... Bulletin Board, ... a well stocked Campus Book Store for the purchase of anything and everything that pertains to Christian Science and Mary Baker Eddy," a listing of Christian Science teachers and practitioners, "a 24-hour a day telephone access to the University's Christian Science Healing Infirmary," annual seminars, class instructions, and a "multi-media production studio for producing radio and television specials...." Id. "All contributions to help establish and promote this educational and inspirational outreach are both tax deductible and deeply appreciated!" Id. Not long thereafter, these items were placed on the web site. The undersigned concludes this conduct occurred "at or about the time of the injury" for purposes of long arm jurisdiction. As seen from Exhibit G, from its origination, the web site was interactive, not passive.
Having concluded that the requirements of North Carolina's long arm statute have been met, the undersigned will next consider whether due process is offended by exercising jurisdiction. "General jurisdiction exists when a defendant is domiciled in the forum state or his activities there are `substantial' or `continuous and systematic.'" Panavision Int'l, L.P. v. Toeppen, 141 F.3d 1316, 1320 (9th Cir. 1998) (quoting Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414-16, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984)). Where, however, the plaintiff's cause of action "is related to or arises out of the defendant's contacts with the forum, the court is said to exercise `specific jurisdiction.'" IMO Industries, Inc. v. Kiekert AG, 155 F.3d 254, 259 (3rd Cir.1998). The Supreme Court has prescribed a three part test to determine whether specific jurisdiction exits: (1) the nonresident defendant must do something by which he purposefully avails himself of the privilege of conducting activities in the forum and thus, invokes the benefits and protections of its laws; (2) the claim must arise out of those forum-related activities; and (3) exercise of jurisdiction must be reasonable. Burger King Corp., supra; Federal Insurance Co. v. Lake Shore, Inc., 886 F.2d 654, 660 (4th Cir.1989).
The Nolan Defendants took direct actions to create a connection with North Carolina by enlisting Robinson to download their web page design onto his domain, located and maintained in North Carolina. CompuServe, Inc. v. Patterson, 89 F.3d 1257, 1264 (6th Cir.1996). Thereafter, Nolan sent information consistently into North Carolina electronically for use *975 on the web site. Id. The information which he provided on this site, albeit of a religious nature, also included solicitations for contributions and sales of merchandise. Id. All of this was done through Robinson's domain for "The Roan Mountain Institute" in Bakersville, North Carolina.
Moreover, trademark infringement is akin to tort cases and thus jurisdiction may attach when the defendant's conduct is either aimed at or has an effect on the forum state. Panavision Int'l, 141 F.3d at 1321. Nolan purposely used marks confusingly similar to Plaintiffs' marks throughout his web site which is accessible only through a domain located in North Carolina. Clearly, Plaintiffs were injured by the use of those infringing marks in North Carolina. Indeed, it was clear from the information on the site and by the parties' admissions that Robinson and Nolan had entered into a venture to persuade those viewing the sites that they represented the "true" Christian Science Church. However, in doing so, they used Plaintiffs' marks and thus, created confusion. The undersigned concludes both that the Nolan Defendants purposefully availed themselves of the privilege of conducting activities in North Carolina and that their conduct had effects in this state. Id. "Though [Defendants' activities] were [directed] outside of [North Carolina], it [is] clear that the defendant[s'] deliberate choice of the plaintiff[s'] trademark[s], and [their] subsequent [infringements thereof] ... targeted th[e] plaintiff[s]." Bancroft & Masters, Inc. v. Augusta Nat'l, Inc., 223 F.3d 1082, 1088 (9th Cir.2000).
The second requirement for specific jurisdiction is also met. The claim undisputably arises from the Defendants' forum related activities. "But for [the Defendants'] conduct, this injury would not have occurred." Panavision, 141 F.3d at 1322.
The last factor for consideration is that of reasonableness.
For jurisdiction to be reasonable, it must comport with fair play and substantial justice. Burger King explicitly places upon the defendant the burden of demonstrating unreasonableness and requires the defendant to put on a "compelling case." The reasonableness determination requires the consideration of several specific factors: (1) the extent of the defendant's purposeful interjection into the forum state; (2) the burden on the defendant in defending in the forum; (3) the extent of the conflict with the sovereignty of the defendant's state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum.
Bancroft & Masters, supra (citing Burger King, 471 U.S. at 476-77, 105 S.Ct. 2174). The Court has rejected already the Defendants' arguments that they did not target any activity toward this forum. From its origination, "The Christian Science University" was an interactive web site capable of an exchange of information with a user and on which solicitations for donations were made. Zippo Mfg. Co. v. Zippo Dot Com, Inc., 952 F.Supp. 1119 (W.D.Pa. 1997). Later, products were offered for sale. Despite Defendants' arguments that no products have actually been sold and few "hits" have been sustained, the undersigned concludes these are no indication of the numbers of North Carolina residents who have visited the site, reviewed the information thereon and seen the infringing marks. Superguide Corp. v. Kegan, 987 F.Supp. 481 (W.D.N.C.1997). Moreover, when dealing with a nonprofit organization, the solicitation of funds over a web site constitutes the transaction of business within the forum. Heroes, Inc. v. Heroes Foundation, 958 F.Supp. 1 (D.D.C.1996).
The Nolan Defendants specifically targeted North Carolina through Robinson. Nolan and Robinson both have a long history of disputes and litigation with the Plaintiffs. Their decision to enter into this *976 venture to convince Internet users that they constitute the "true" church was jointly made and carried through Robinson's North Carolina domain. Indeed, his web site has a hyperlink to "The Christian Science University" and vice versa.
Defendants claim that North Carolina has no interest in the adjudication of this action which involves Massachusetts Plaintiffs. In addition to the claims for trademark infringement, Plaintiffs stated a claim for unfair trade practices under N.C.Gen.Stat. § 75-1.1, et seq. North Carolina has a strong interest in any act or practice which adversely affects the public interest and has provided not only private civil causes of action therefore but also has empowered the State's Attorney General to bring criminal charges. N.C.Gen.Stat. § 75-1.1; State v. Rich Food Services, Inc., 535 S.E.2d 84 (2000). Moreover, the statute applies to trade secret violations. Drouillard v. Keister Williams Newspaper Servs., Inc., 108 N.C.App. 169, 423 S.E.2d 324 (1992).
The Defendants also state, without any showing, that it is as inconvenient for the Plaintiffs to litigate this matter in North Carolina as it is for them. However, at the hearing, Plaintiffs' counsel explained that the Plaintiffs had intentionally chosen the North Carolina forum, instead of the Massachusetts forum, because of Defendant Robinson's residence here. This, he stated, would obviate the need for two separate actions. Defendants have made neither argument nor showing as to the other Burger King factors. "This is inadequate to discharge Burger King's requirement that the defendant demonstrate a `compelling case,' focused on the seven specific factors listed above, in order to establish reasonableness." Bancroft & Masters, supra. The undersigned therefore concludes this is a proper case for the exercise of specific jurisdiction.
The jurisdictional issue having been resolved, the Defendants' have failed to show a substantial likelihood of success on the merits of the appeal. Concerning the question of irreparable injury to the Defendants, they make only a blanket statement that they will suffer such injury if they are precluded from using the title "The Christian Science University" in their web site. This is insufficient to make such a showing. Moreover, the Defendants concede they have not sold products from the site; thus, they cannot show irreparable injury which requires a causal connection between the alleged harm and the action to be enjoined. Faulkner v. Jones, 10 F.3d 226, 235-36 (4th Cir.1993). On the other hand, the Plaintiffs will suffer irreparable harm if the injunction is lifted because such injury regularly follows infringing conduct. Lone Star Steakhouse & Saloon v. Alpha of Va., Inc., 43 F.3d 922 (4th Cir.1995). And, it would not be in the public interest to allow confusion to continue as to the sponsorship and source of the Defendants' web site. Washington Speakers Bureau, Inc. v. Leading Authorities, Inc., 49 F.Supp.2d 496 (E.D.Va.1999). The Defendants' motion for a stay must therefore be denied.

2. Contempt.
Before a Court may make a finding of civil contempt, there must be clear and convincing evidence of the following: (1) the existence of a valid decree of which the alleged contemnor had actual or constructive knowledge; (2) the decree was in favor of the party moving for contempt; (3) the alleged contemnor violated the terms of the decree by his conduct and had knowledge, at least constructive knowledge, of such violations; and (4) the moving party was harmed by the violation. Ashcraft v. Conoco, Inc., 218 F.3d 288, 301 (4th Cir.2000). Wilfulness is not an element of civil contempt. In re General Motors, Corp., 61 F.3d 256, 258 (4th Cir. 1995).
At the hearing, Plaintiffs' counsel argued that the Nolan Defendants continue to use the same infringing conduct. The only deference given to the Judgment *977 has been the addition of a disclaimer on the home page of the web site which proclaims the University is not affiliated with any religious denominations. They continue to use a confusingly similar imitation of the "Cross and Crown" mark as well as the common law marks.
Defendant Robinson also continues to use the "Cross and Crown" mark on a chat room and continues to publish the "Christian Science Monitor of Bakersville," the "Christian Science Beacon," and displays a variation of the "Dome Design" mark. Neither Defendant has surrendered the domain names; indeed, Defendant Robinson has admitted registering other domain names using Plaintiffs' marks. Defendant's Response to Plaintiffs' Motion for an Order Holding Defendants in Contempt, at 2.
Counsel for the Nolan Defendants argued that their conduct is not contemptuous because of the addition of a disclaimer to the home page of the site. In addition, counsel argued that the use of the term "Christian Science Digest" is not infringement because there is no mark for that specific term. And, counsel claimed that Nolan had sufficiently modified his use of the "Cross and Crown" mark by using a different scriptural verse and "tipping the crown to the other side." Finally and incredibly, he claimed that his client, whom he admitted had avoided personal service of process, should be absolved of contempt because the action was not fully litigated and the injunction came about as a result of a default judgment. No comment is warranted as to that claim.
Defendant Robinson argued that the undersigned's rulings have vaulted "the Mother Church" over his organizations. Robinson, who at the hearing wore a shirt containing an infringing likeness of the Plaintiffs' "Cross and Crown" mark, advised that he has removed the "Cross and Crown" and "Wheat Sheath" marks from the Roan Mountain Institute web page. In defense of his behavior, Robinson stated he had only recently learned that constitutional issues raised in federal courts are considered "across the board" to be frivolous. During the hearing, Robinson submitted a document for filing entitled "Answer to the Court's Order to Show Cause," despite the fact that he had previously filed a response. In this document, Robinson claims this Court lacks jurisdiction over him "as evidenced by the yellow fringe of Maritime Law encompassing the flag in this courtroom of the Commercial Corporation based in the District of Columbia called the United States." Defendant Robinson's Answer to the Court's Order to Show Cause, at 3. Robinson also pointed out that he is not the person named in the complaint but, instead, "David E Robinson (Caps and lower case)" and thus, is not under this Court's jurisdiction. Id., at 4.
The Nolan Defendants and Robinson argue the Judgment is not a valid decree although they admit actual knowledge of its existence. The Nolan Defendants would have the undersigned reconsider the issues of infringing conduct despite the fact that the default judgment has not been vacated. Robinson continues to argue the correctness of the rulings against him. Neither position impacts the validity of the Judgment, unless and until overturned by a higher court. Likewise, none of the Defendants dispute that the Judgment is in favor of the Plaintiffs.
Nor do the Defendants seriously contend that their conduct did not violate the terms of the decree. Their arguments, in sum, are that because the rulings contained within the Judgment are incorrect, their conduct cannot be contemptuous. This is not sufficient to withstand a finding of contempt. Moreover, as recently as the day of the hearing, the Defendants continued to use infringing marks on their web sites.
Likewise, the Nolan Defendants argue that their disclaimer on the home page of their web site renders their conduct noncontemptuous. However, the inclusion of *978 a disclaimer was not a part of the Judgment and this is not the forum to argue for the same. Defendants defaulted; they never raised a "disclaimer defense" because the disclaimer came about only after the Judgment was entered. Harley-Davidson, Inc. v. Grottanelli, 164 F.3d 806, 813 (2nd Cir.1999) ("although in theory a prominent disclaimer of association with a prior user can reduce or eliminate confusion, the courts have ordinarily found the use of disclaimers insufficient to avoid liability for infringement."); Alexis Lichine & Cie v. Sacha A. Lichine Estate Selections, Ltd., 45 F.3d 582, 587 (1st Cir.1995) (Noting "deep skepticism of the utility of disclaimers.").
As noted infra, Plaintiffs have shown harm by virtue of the finding that infringement has occurred. And, although wilfulness is not a requirement to a finding of civil contempt, all of the Defendants have wilfully disobeyed the Judgment. The caustic nature of the pleadings filed by the Defendants and the history of contentious conduct among the parties convinces the undersigned that future contemptuous conduct will continue absent a finding of civil contempt. The conduct of the Defendants in defying this Court's Judgment constitutes civil contempt.
Nonetheless, Plaintiffs do not seek a compensatory sanction, only a coercive monetary fine and reasonable attorneys' fees. Monetary sanctions "to coerce obedience to a court order" are appropriate in the context of civil contempt. In re General Motors Corp., 61 F.3d at 258. "The appropriate remedy for civil contempt is within the court's broad discretion." Id., at 259.
The undersigned finds that the Defendants shall comply with the Judgment entered July 6, 2000, on or before October 20, 2000. In the event that compliance is not made, each Defendant shall be fined a monetary penalty of $250 per day until compliance is shown. Plaintiffs may provide the Court with appropriate affidavits showing costs and attorneys' fees incurred as a result of the Defendants' failure to abide by the Judgment.

ORDER
IT IS, THEREFORE, ORDERED that the motion of the Nolan Defendants for a stay of injunction pending appeal is hereby DENIED; and
IT IS FURTHER ORDERED that the Plaintiffs' motion for a finding of civil contempt is hereby GRANTED; and
IT IS FURTHER ORDERED that the Defendants are hereby IN CIVIL CONTEMPT of this Court's Judgment entered July 6, 2000; and
IT IS FURTHER ORDERED that each of the Defendants may purge such contempt by complying with the Judgment entered July 6, 2000, on or before October 20, 2000, and by filing proof of compliance with the Court; and
IT IS FURTHER ORDERED that in the event the Defendants do not purge such contempt, they shall be fined the sum of $250 per day after the October 20th deadline and such fine shall continue until such time as the Defendant in question has complied fully with the Judgment filed July 6, 2000; and
IT IS FURTHER ORDERED that in any event, the Plaintiffs' are to provide the Court with the appropriate information supporting their request for attorneys' fees.
NOTES
[1] For future reference, it is customary for counsel to provide copies of such motions, filed on the eve of a hearing, to the Court by facsimile or overnight express mail.
[2] That Rule provides in pertinent part that when "an appeal is taken from a[] ... final judgment granting ... an injunction, the court in its discretion may suspend ... an injunction during the pendency of the appeal upon such terms ... as it considers proper for the security of the rights of the adverse party."
[3] Defendant Nolan did not appear in person at the hearing.
[4] Normally, a court addresses jurisdictional issues first. However, in this case those issues are intertwined with the application of the Lanham Act and consideration of that issue first actually aids the resolution of jurisdiction.
[5] "A word used as an Internet domain name identifies a place on the Internet where a `home page' or `web site' can be located.... `[W]eb site' refers to a location on the Internet accessed by a domain name. `Home page' is used to refer to an entry page of focal point document on a web site." 4 McCarthy on Trademarks and Unfair Competition, § 25:71, n. 1 (4th ed.2000).
[6] The Court recognizes that in North Carolina, the long arm statute is "`designed to extend jurisdiction over nonresident defendants to the fullest limits permitted by the Fourteenth Amendment's due process clause,'" and thus, the only inquiry is whether Defendants have sufficient contacts with the forum state so as not to offend traditional notions of fair play and substantial justice. Century Data Systems, Inc. v. McDonald, 109 N.C.App. 425, 427, 428 S.E.2d 190, 191 (1993) (quoting Church v. Carter, 94 N.C.App. 286, 289, 380 S.E.2d 167, 169 (1989)). However, because the Defendants specifically attack the application of the long arm statute to these facts, that issue is addressed.
[7] The only means of accessing The Christian Science University web site was through Robinson's "The Roan Mountain Institute" web site which has a North Carolina address.
[8] The statute reads in pertinent part: "In any action ... claiming injury to ... property within this State arising out of an act ... outside this State by the defendant, provided in addition that at or about the time of the injury ... (b) Products, materials or things processed, serviced or manufactured by the defendant were used or consumed, within this State in the ordinary course of trade." N.C.Gen.Stat. § 1-75.4(4)(b).